# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **MOIRA K. MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 09-0146-KD-B** |
| | ) | |
| **UNIVERSITY OF SOUTH ALABAMA,** | ) | |
| **and SUE WALKER, CHRIS** | ) | |
| **HOLLINGSWORTH, JOHN** | ) | |
| **HALBROOKS, and BECKY** | ) | |
| **McLAUGHLIN, in their individual** | ) | |
| **capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This action is before the Court on the motion for summary judgment and evidence in

support filed by defendants University of South Alabama, Sue Walker, Chris Hollingsworth, and

Becky McLaughlin, (doc. 53), plaintiff Moira K. Miller's response in opposition and evidence in

support, (docs. 59, 60)[12] , and defendants' reply (docs. 65, 66).  Upon consideration, and for the

---

[1]  Miller's motion for leave of court to extend page limit wherein she seeks an additional six pages for her response, (doc. 55) is **GRANTED** and defendants' motion to strike Miller's six pages in excess of the limitation set forth in Local Rule 7.1(b) (doc. 61) is **DENIED**.  However, the Court notes that Miller's brief was unnecessarily excessive and contained irrelevant discussions regarding Miller's concerns and beliefs regarding diversity (e.g., the article Voodoo Genetics and Sea Chanteys: Locating the Whale's Footprint of Essentialism in Contemporary Departments of English).  The Court considers these discussions irrelevant because there is no evidence that these concerns and beliefs were expressed to the search committee members, or known by the decision makers at the time of Miller's non-reappointment.  In any event, Miller's counsel, a respected member of this Bar, is cautioned to abide by the page limitation in all future filings.

[2] Defendants move to strike Miller's Statement of Facts (doc. 57) on basis that the document when combined with the response to the motion for summary judgment exceed the page limitation set forth in Local Rule 7.1(b).  The motion (docs. 61, 64) is **DENIED**. Defendants also move to strike the affidavits of Amber Davis, John Pepe, and Christopher L.

reasons set forth herein, the motion for summary judgment is **GRANTED**.

I. Background

Miller was employed at the University of South Alabama (USA) as a tenure track Assistant Professor of English until USA made a decision in April 2007 that Miller would not be reappointed to her position. Miller's last day of employment was May 15, 2008. In Count One of the complaint, Miller alleges that defendant USA violated her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. (Title VII). Specifically, Miller alleges that she was terminated in retaliation for her opposition to discriminatory hiring practices in the English Department. In Count Two, Miller brings her claim pursuant to 42 U.S.C. § 1983 alleging a violation of her right to freedom of speech under the First Amendment. Miller alleges that the individual defendants Walker, Hollingsworth and McLaughlin retaliated against her by recommending that she not be reappointed to her position because of her opposition to discriminatory hiring practices.

II. Findings of Fact

USA employees

Miller was a tenure track Assistant Professor at USA in the English Department. She began working at USA in 2003. On April 9, 2007, Miller received notice from USA that she would not be reappointed and her professorship terminated in May 2008 (doc. 1) (doc. 59-2, p.1,

---

Starkey, evidence relating to the non-reappointment of another professor in 1997, and Miller's Exhibits 60 and 62 (doc. 64). Because the Court did not rely upon these documents or evidence to reach its decision, the motion to strike is **MOOT**. See Hallmark Developers, Inc. v. Fulton County, Ga., 466 F.3d 1276, 1288 (11th Cir. 2006) ("Hallmark challenges the District Court's decision to admit the testimony of Mr. Hammond. . . . We do not reach this issue because the District Court's judgment does not depend on the admissibility of Mr. Hammond's testimony.")

Miller Affidavit).

Defendant Dr. Sue Walker is the Chair of the English Department.  She supervised the faculty, including Miller.  In April 2007, Walker made the written recommendation to Dean G. David Johnson that Miller not be reappointed to her position.

As Chair of the English Department, Dr. Walker was responsible for appointments to faculty search committees.  Walker appointed defendants Dr. Becky McLaughlin, Dr. Cris Hollingsworth and Dr. John Halbrooks[3] to search committees for professor positions in the areas of Twentieth Century Literature, Renaissance, and Creative Writing.  Ultimately the search for the Creative Writing position was cancelled.  Walker also served on the search committees (doc. 53-15, Walker Affidavit, p. 1-2)

Dean Johnson, at all relevant times, was Dean of the College of Arts and Sciences. (doc. 53-14, p. 2-3).  Johnson received Walker's recommendation to non-reappoint Miller, and after his concurrence, the recommendation was made to Dr. Pat Covey. (Id.)

Covey, at all relevant times, was the Senior Vice President for Academic Affairs at USA and the Affirmative Action Officer for the English faculty.  On April 9, 2007, Covey signed the letter of non-reappointment which was sent to Miller. (doc. 53-21, Covey Affidavit, p. 1-2). Covey states that he was the final decisionmaker and that he relied upon the recommendation of Johnson and Walker, as well as "feedback from other faculty members about their interactions with Dr. Miller". (Id. p. 2).  Covey stated that Miller had never complained "about allegedly unfair hiring practices at USA and no such concern on her part had been relayed to [Covey] by anyone else." (Id.).

---

[3] Halbrooks has been dismissed from this litigation.

Defendant Hollingsworth, at all relevant times, was an untenured Assistant Professor in the English Department. Hollingsworth was chair of the search committees. (doc. 53-16, Hollingsworth Affidavit, p. 2-3). Defendant McLaughlin, at all relevant times, was an Associate Professor in the English Department. (doc. 53-20, McLaughlin Affidavit p. 2). Defendant Halbrooks, at all relevant times, was an Assistant Professor in the English Department. (doc. 53-22, p. 2, Halbrooks Affidavit).

As of January 2007, the English Department, as noted *supra*, was chaired by a woman (and had been the entire time of Miller's employment) and was composed of fourteen tenure track or tenured faculty: seven males and seven females. (doc. 53-14, p. 9, Johnson affidavit). At the time Miller was hired, the Department was composed of sixteen tenure track or tenured faculty members: eight males and eight females. (Id.). At the time Miller was hired, the English Department had one African American professor. (Id.). During the time period after Miller was hired in 2003, three African American professors were hired, two of which remained on the faculty in January 2007. (Id.).

The Faculty Meeting

In January 2007,[4] a faculty meeting was called to discuss the final candidates who had been selected by the search committee and invited to USA for further interview. Information on the final candidates was made available to the faculty in early December 2006. (doc. 53-16, Hollingsworth Affidavit, Exhibit 1).

---

[4] Miller alleges that this meeting occurred January 27, 2007 (doc. 60, Miller response ). However, January 27, 2007 was a Saturday. Defendants assert that the meeting occurred on January 9, 2007.

In regard to what transpired at the meeting, Miller states as follows:[5]

26.  On or about January 27, 2007, I attended a faculty meeting specially called to discuss the candidates being brought to campus for three open positions in the English Department.  During the faculty meeting, the Hiring Committee announced the three candidates they intended to interview further for each of the three positions.  It quickly became clear that the search committee had narrowed their choices to nine white males which I considered troubling due to the lack of diversity in the results of the hiring and search. . . . [6]

27.  At the appointment of Walker, Chris Hollingsworth, a junior faculty member, was made Chair of all three of these important searches. . . . [7]

29.  Due to my personal concerns about the lack of diversity in the search Committee's results, I inquired about the action taken by the Committee to insure a diverse applicant pool.  I inquired regarding the language of the job descriptions, the methods by which the position was advertised, how the candidate-pool looked in terms of diversity, and about the conversations committee members had about candidate qualifications. . . . I inquired regarding the language of the advertised position as well as the method and manner that the position was advertised and/or candidates were sought.[8]

30. Halbrooks, a Hiring Committee member, began to respond to some of my questions when I was verbally attacked by Hollingsworth who stated in an accusatory tone, "You are questioning the work of the Committee," and "Leave it alone, Moira."  Hollingsworth told me I should trust that my colleagues took the right actions in the hiring process.

31.  I inquired with all three Hiring Committee members the next day to ease

---

[5] Defendants move to strike certain paragraphs from Miller's affidavit. Specifically, paragraphs 2, 7, 19, and 22 (doc. 64).  The Court did not rely upon the factual allegations in those paragraphs to reach its decision.  Accordingly, the motion to strike as to those paragraphs is **MOOT**.

[6] Defendants move to strike the deleted portion of this paragraph (doc. 64, p. 3,¶ c, d). The motion is **GRANTED**.

[7] Defendants move to strike the deleted portions of paragraph 27 and paragraph 28 (doc. 64, p. 4, ¶ e, f.) .  The motion is **GRANTED.**

[8] Defendants move to strike this paragraph because it contradicts Miller's deposition testimony that she could not recall specifically what she said (doc. 64, p. 4, ¶ g).  The motion is **DENIED**.

emotions since Hollingsworth had been so angry with me. None of the Committee member would discuss the search process with me or provide me with information regarding the search as I had requested.

32. When I met with Hollingsworth the next day, he stated to me, in a very hostile manner, that I was "questioning the work of the Committee" and to "stay out of it."

33. When I approached Halbrooks the next day, he did not appear angry, but made it very clear he would not provide any additional information to me regarding the search. Halbrooks stated that he had some of the same concerns, but that he had been diligent in his search efforts. . . .[9]

34. When I approached McLaughlin, she appeared to be agitated at my inquiries and said she "didn't want to talk about it." McLaughlin refused to provide me with answers to my questions on diversity.

35.[10]

36. Diversity within a college is very important to insure that students receive many different theories, perspectives, and ideas about any given subject. Diversity within a department facilitates a better educational environment and learning experience for students, and it is, therefore, critical to consider when hiring new faculty members especially in a department and within a university where faculty and administration have been predominantly white and the student body quite diverse.

37. When I learned of the selection of "nine white males" as top candidates for three open faculty positions, I did not accuse any one person of having a discriminatory animus. Instead, I raised issues and concerns regarding the hiring process and addressed questions to committee members regarding the selection process. My concern was heightened due to my knowledge and concern over the lack of diversity in the English Department, as well as the department's inability to retain minority faculty members.

38. I considered it part of my job as a faculty member to work toward more sound governance by pointing out diversity concerns and suggesting methods of

---

[9] Defendants move to strike the deleted portions of paragraph 33 (doc. 64, p. 4, ¶ h). The motion is **GRANTED**.

[10] Defendants move to strike this paragraph. (doc. 64, p. 4, ¶ i). The motion is **GRANTED**.

improvement. My suggestions, however, were not taken seriously and, in fact, were often met with hostility.

(doc. 59-2, Miller Affidavit, p. 7-10).[11]

Ultimately, Miller states as follows:

59. Based on my observations and experience at USA, I believe my non-reappointment, as well as the removal of my duties, was action taken by Walker and/or USA in retaliation for my opposition and advocacy of minority rights, including my January opposition to the lack of diversity in the English Department.

(doc. 59-2, Miller Affidavit, p. 17).

Miller does not provide any evidence that Walker was informed of Miller's specific comments and concerns about the faculty selection process. Rather, Miller merely states in her brief that Walker was "present" at the faculty meeting.[12]

Walker stated that she attended the meeting but left at the end and did not hear Miller's conversation with Halbrooks and Hollingsworth (doc. 53-15, p. 5, Walker Affidavit). Walker further stated that she "learned about the discussion much later" and that her "understanding was that Dr. Miller had raised reasonable questions to the search committee, leading to a shared consensus that there was no irregularity, after which time the matter ended." (doc. 53-15, p. 5, Walker Affidavit).

Specifically, Walker stated:

---

[11] Defendants move to strike paragraphs 39, 47, and 50 of Miller's Affidavit (doc. 64). The Court did not rely upon the factual allegations in those paragraphs to reach its decision. Accordingly, the motion to strike as to those paragraphs is **MOOT**.

[12] The deposition pages cited in Miller's Statement of Facts (doc. 57, ¶ 44, p.12) do not support the contention that Dr. Walker was privy to the conversation at issue. Moreover, at her deposition Miller testified that she did not remember whether Walker was there (doc. 53-3, p. 39, Miller deposition Vol. I, p. 85).

While I had had prior discussions with Dr. Coleman, Dr. McLaughlin and Dr. Hollingsworth regarding concerns with Dr. Miller's collegiality and scholarship (as previously testified to in these proceedings), none of them ever discussed with me the fact that [Miller] had supposedly raised concerns with USA's hiring processes, and I do not believe that she did, other than with respect to a brief discussion at the end of that one faculty meeting between Dr. Miller and Dr. Hollingsworth about the specific search result, i.e., the fact that these two particular searches had resulted in nine white male candidates, which itself is an inaccurate remark.[13]

(doc. 53-15, p. 5, Walker Affidavit).

Walker further stated that

I am not certain when I did first hear about Dr. Miller's "nine white males" remark, but it was long after the non-reappointment decision and I remember being very surprised about the nature of her lawsuit. She never raised any diversity or other concerns while at USA in a manner intended to convey that she felt that there was something discriminatory about USA's hiring or other employment practices, or event that someone in particular was not doing enough about pursuing diversity.

(doc. 53-15, p. 7, Walker Affidavit).

Hollingsworth recounts the encounter with Miller as follows:

10. At the meeting, Dr. Miller asked something to the effect of "Where are the women?" I remember nothing about a reference to minority applicants, although, truly, this incident seemed so unremarkable at the time that it is hard to recollect specifically. One of my colleagues recalls that I responded to Dr. Miller with the following statement: "We're not hiring people for their plumbing." Assuming I said this, I likely meant this pithy comment to be clever and amusing - - and certainly to express that the searches were conducted procedurally, impartially, and for the purpose of hiring the best possible candidates. I recall giving my report to the faculty at this meeting, and then Drs. McLaughlin and Halbrooks speaking.

(doc. 53-16, p. 5-6, Hollingsworth Affidavit). Hollingsworth also stated that Miller never

---

[13] Walker alludes to the cancellation of the search for a Creative Writing professor, such that the results of the searches were six white males. The Creative Writing professorship was filled for one semester by a female professor, Dr. Patricia Foster (doc. 53-15, p. 2, Walker Affidavit).

inquired of him "before that time, about how the particular searches . . . were going or what the applicant pool looked like for the positions for which we were hiring" (Id.).

McLaughlin states that the highest rated candidates were white males (doc. 53-20, p.2, McLaughlin Affidavit). McLaughlin states that she did not discuss the search or the results with Miller before or after the meeting and that Miller's "comments at that meeting were isolated and unremarkable, exciting no controversy and ending after that one meeting, to my knowledge" (Id. p. 5).[14] Halbrooks stated that Miller did not complain to him about the search procedures either before or after the faculty meeting (doc. 53-22, p. 4, Halbrooks Affidavit). Halbrooks testified that Miller approached him immediately after the faculty meeting (doc. 59-7, p. 6, Halbrook deposition, p. 17). Halbrook testified that he did not recall Miller's specific words but he did "recall her asking about the demographic profile of the candidates who were coming to campus." (doc. 59-7, p. 7-8, Halbrook deposition, p. 17-18). Halbrooks further testified as follows: "That's about it.". . . I don't recall her specific words. She expressed concern that the candidates were, in her mind, homogenous. . . . I don't recall those specific words ["nine white males"]. I've seen those words many times since then, but I don't know if I remember that at the time." (Id.)

<u>Walker's recommendation</u>

On April 8, 2007, approximately three months after the faculty meeting and thirteen

---

[14] When asked whether Dr. McLaughlin was in the room at the end of the faculty meeting, Miller testified: "Was she in the room at the time? You would have to ask her." (doc. 53-3, p. 39, Miller deposition Vol. I, p. 85).

months before the expiration of Miller's appointment,[15] Walker gave the following

recommendation to Johnson:

> After careful consideration and after consulting with a number of colleagues, I regrettably feel that it is in the best interest of the English Department that Dr. Moira Amado Miller be non-reappointed. There are serious problems regarding her collegiality. In addition, Dr. Amado-Miller has a weak scholarly record and only "favorable," rather than good or excellence reviews in the area of teaching. She does not appear to be a good fit for our department.

(doc. 53-14, p. 17, Exhibit 2, to Johnson's Affidavit).

Dean Johnson then made the recommendation to Dr. Covey, the Senior Vice President

for Academic Affairs (doc. 53-14, Johnson Affidavit, p. 3). On April 9, 2007, Dr. Covey signed

a letter of non-reappointment (doc. 53-21, Covey Affidavit, p.2), which was delivered to Miller

on or about April 17, 2007 (doc. 59-2, Miller Affidavit, ¶ 42)

Supervisory Authority over Miller

Walker had direct supervisory authority over Miller and made the recommendation to

Dean Johnson that Miller not be reappointed to her position on the faculty (doc. 1).

Neither Hollingsworth nor McLaughlin had the authority to terminate Miller's

employment. Nor did they have authority to recommend to Dean Johnson that Miller be non-

reappointed (doc. 60, p. 21, n.18, Miller response); (doc. 53-16, Hollingsworth Affidavit, p. 6-7).

III. Summary Judgment Standard

Summary judgment should be granted only "if the pleadings, the discovery and

---

[15] The Faculty Handbook required "[w]ritten notice of non-reappointment or of intention not to recommend reappointment" be given to Miller at least twelve months before the expiration of her appointment which was to occur in May 2008. (Doc. 53-14, p. 3, Johnson Affidavit; doc. 53-14, p. 13-14, Exhibit to Johnson Affidavit, Faculty Handbook, § 3.15.2, The Standards for Notice of Non-Reappointment, p. 28-29) ("At least twelve months before the expiration of an appointment after two or more years in the institution.") (Id. at § 3.15.2.3).

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Id.</u> quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. <u>Id</u>. "If the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment." <u>Id</u>. quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (footnote omitted) (internal quotations omitted).

"In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual

disputes that are material preclude entry of summary judgment. <u>Lofton v. Secretary of Dept. of Children and Family Services</u>, 358 F.3d 804, 809 (11th Cir. 2004). "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 807 (11th Cir. 2010) (citation omitted). Also, "what is considered to be 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the facts at this stage of the proceeding for summary judgment purposes." <u>Cottrell v. Caldwell</u>, 85 F.3d 1480, 1486 (11th Cir. 1996).

"A district court should grant summary judgment when, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1288 (11th Cir. 2004) citing <u>Nolen v. Boca Raton Cmty. Hosp.</u>, Inc., 373 F.3d 1151, 1154 (11th Cir. 2004) (internal quotatins omitted). Overall, the Court must "resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to judgment as a matter of law under that version of the facts." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1288 (11th Cir. 2004) citing <u>Durruthy v. Pastor</u>, 351 F.3d 1080, 1084 (11th Cir. 2003).

IV. <u>Analysis</u>

A. <u>Count One - Title VII Opposition Clause</u>

Title 42 U.S.C. § 2000e-3, titled "Other unlawful employment practices" sets forth as follows:

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]

42 U.S.C. § 2000e-3(a).

Therefore, under Title VII, an employee who opposes an unlawful employment practice may seek protection from retaliation by their employer.  However, the employee has the initial burden of establishing a prima facie case of retaliation. Brochu v. City of Riviera Beach, 304 F. 3d 1144, 1155 (11th Cir. 2002), modification on other grounds recognized in D'Angelo v. School Bd., 497 F.3d 1203, 1208-10 (11th Cir.2007).   To do so, the employee "must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two events." Id.  If the employee "makes out a prima facie case of retaliation, the burden shifts to the defendant [employer] to produce legitimate reasons for the adverse employment action.  If the defendant does so, [then the employee] must show that the reasons the defendant gave were pretextual." Id. (internal quotations and citations omitted).

Also, for an employee "to engage in statutorily protected expression under the opposition clause of 42 U.S.C. § 2000e-3(a), he must have a good faith, ... reasonable belief that the actions he is opposing would be unlawful under the statute at issue." Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1312 (11th Cir. 2002) (internal quotation marks omitted).  A "good faith, reasonable belief" has "both a subjective and an objective component".  Butler v. Alabama Dep't of Transp., 536 F.3d 1209, 1213 (11th Cir.2008).  The employee must show a subjective, good faith, belief that the employer engaged in an unlawful employment practice, and that belief must be "objectively reasonable in light of the facts and record presented." Butler, at 1213; Little v.

13

<u>United Technologies, Carrier Transicold Division</u>,103 F.3d 956, 960 (11th Cir.1997) ("A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.").

"While [an employee] can prevail on a retaliation claim based on opposition to an employment practice that is not actually unlawful, [the Court must] consider the controlling substantive law in this circuit" when assessing whether the employee's mistaken belief is objectively reasonable. <u>Butler,</u> at 1214; <u>see</u> <u>Clover v. Total System Services, Inc.,</u> 176 F.3d 1346, 1351 (11th Cir. 1999) ("The objective reasonableness of an employee's belief that her employer has engaged in an unlawful employment practice must be measured against existing substantive law.");  <u>Harper v. Blockbuster Entertainment Corp.,</u> 139 F.3d 1385, 1388 n.2 (11th Cir.1998) ("[F]ailure to charge the employee who opposes an employment practice with substantive knowledge of the law 'would eviscerate the objective component of our reasonableness inquiry'").

Defendant USA argues that Miller's "opposition" was vague at best and that Miller cannot demonstrate an objectively reasonable belief that USA engaged in an unlawful employment practice.  Specifically, USA argues that Miller failed to point to any practice as discriminatory but instead made accusations of inadequate diversity progress.

Miller responds that she engaged in a protected act because she "raised inquiries about diversity" (doc. 60, p. 4) and that she "tried to address specific aspects of the selection process to

assess and rule out individual biases and/or action that could have influenced and produced the homogenous results of 'nine white males.'" (Id.) Miller states that her "questions were specific to the make-up of the applicant pool, the language of the advertisements for the position, the placement of ads for the position, and particular aspects of the selection process." (Id. p. 5) Miller also asserts that she "raised questions as to the non-selection of minorities touching on concerns of discrimination in the hiring and selection process[]" and that "[t]he Hiring Committee's search (a narrowed search result consisting of "nine white males") was sufficient, standing alone, to cause a reasonable person to raise an eyebrow."[16] (Id. p.7-8).

Miller's argument appears to mistakenly equate speech which addresses a matter of public concern (an element of a First Amendment retaliation claim) with speech which opposes a practice made unlawful under Title VII (an element of a Title VII based retaliation claim). Obviously, the two elements are not the same. The fact that all of the final applicants for a faculty position are of the same race and gender may be an issue of public concern, however, this singular fact does not constitute a basis for a Title VII violation claim.[17]

_____

[16] The Court notes that Miller cites to Brown v. Metropolitan Atlanta Rapid Transit Authority, 261 Fed Appx. 167, 175-176 (11th Cir. 2008), quoting that a "good faith belief was also objectively reasonable because a detached individual could easily have interpreted this cumulative evidence as an indication of an unlawful employment practice". However, the cumulative evidence in Brown consisted of more than search committee results. In Brown, the cumulative evidence consisted of Brown's being told of "lunch meetings" wherein member of management discussed "getting rid of black employees and retaining and promoting whites", id. at n.9, and Brown's subsequent discussion with MARTA's chief legal officer/assistant general manager that he had heard of the "lunch meetings where MARTA employees discussed getting rid of African American employees". Id. at 175.

[17] It is noteworthy that Miller has produced no evidence that she was privy to the applicant pool or even that the applicant pool included qualified minorities that were excluded from the final applicant interviews. In other words, Miller has failed to show any legitimate basis for believing that minority discrimination occurred except to point to the final results. The

Miller's act of inquiring about the processes of the faculty search and advocating for more minority faculty members was not a protected act under Title VII because Miller's inquiry could not be reasonably construed to be opposition to an unlawful employment action. Miller's questions could only be reasonably construed as advocacy for aggressive affirmative action, not an allegation of discrimination. The lack of aggressive affirmative action on the part of USA, even if true, is not a violation of Title VII; nor could a reasonable person believe it was a violation of Title VII in light of clear legal precedent to the contrary. The Supreme Court has stated that "Title VII ... does not demand that an employer give preferential treatment to minorities or women....[Also, Title VII] does not require the employer to restructure his employment practices to maximize the number of minorities and women hired." Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096-1097 (1981). In summary, "Title VII does not require the adoption of affirmative action programs[.]" Holden v. Illinois, Inc., 793 F.2d 745, 749 (6th Cir.1986); see also Rubio v. Florida Dept. of Health, 2007 WL 3119629, 3 (M.D.Fla. October 23, 2007) ("Rubio's retaliation claim fails because his voicing aspirations and dissatisfactions about the results of MCHD's minority hiring is not 'protected activity,' i.e., the equivalent of opposing a practice made unlawful by Title VII.").

---

only evidence of the applicant pool is found in USA's Affirmative Action Report. The race and gender of the sixty-five (65) individuals who completed an application for the two positions that were filled is not discernable from the report. (Doc. 53-15, Exhibits 2-3). However, of the seventy (70) people who expressed interest in the jobs and who returned an Affirmative Action Postcard, only one (1) indicated that his/her race was Black, two (2) indicated they were Hispanic, three (3) indicated they were Asian, and thirty-eight (38) indicated their gender as female.

Moreover, to the extent that Miller's concerns about the means and mode of advertising the position could be construed as a disparate impact claim, such concerns lacked any factual basis tending to support disparate impact.

Since Miller is unable to establish that she engaged in statutorily protected expression (under Title VII), USA is entitled to judgment as a matter of law on this claim. <u>McDowell</u>, 392 F.3d at 1288 ("A district court should grant summary judgment when, after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case.") (citation omitted).

    B. <u>Count Two- First Amendment</u>

The individual defendants, Walker, Hollingsworth, and McLaughlin, argue that Miller cannot prevail on her First Amendment claim because Miller was not speaking as a citizen on a matter of public concern and because Miller cannot show that her speech played a substantial or motivating role in USA's adverse employment action. Miller responds that her "questions and advocacy of minority rights in the selection process was a matter of public concern and protected under the First Amendment". (doc. 60, p. 9).

The Eleventh Circuit has succinctly explained the requirements for prevailing on a First Amendment claim:

> The law is well established that a state employee may not be discharged in retaliation for speech protected under the First Amendment. Nonetheless, a public employee's right to freedom of speech is not absolute. To set forth a claim of retaliation, a public employee must show: (1) she was speaking as a citizen on a matter of public concern; (2) her interests as a citizen outweighed the interests of the State as an employer; and (3) the speech played a substantial or motivating role in the adverse employment action. If the plaintiff establishes these elements, the burden shifts to the defendant to prove it would have made the same adverse employment decision absent the employee's speech.. The first two elements are questions of law that the court decides. The court must examine the statements at issue and the circumstances under which they are made to determine whether or not there is First Amendment protection.

<u>Vila v. Padron</u>, 484 F.3d 1334, 1339 (11th Cir. 2007)(citations omitted).

Thus, the Court must first determine whether, as a matter of law, Miller's statements at

the faculty meeting and the next day, constitute citizen speech on a matter of public concern.  In

Boyce v. Andrews, 510 F. 3d 1333 (11th Cir. 2007), the Eleventh Circuit clarified the inquiry

following the decision in Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1962 (2006).  The

Circuit Court explained as follows:

> Government regulation of employees' speech differs from its regulation of the speech of its citizenry. Connick v. Myers, 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983); Pickering v. Board of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Acting as an employer, the government is afforded broad discretion in its employment decisions. Johnson v. Clifton, 74 F.3d 1087, 1092 (11th Cir.1996). It was well settled by the Supreme Court in Connick and Pickering that, for a government employee's speech to have First Amendment protection, the employee must have (1) spoken as a citizen and (2)  addressed matters of public concern. Following this "directive," we have recognized that we must determine "whether the speech at issue was made primarily in the employee's role as citizen, or primarily in the role of employee." Kurtz v. Vickrey, 855 F.2d 723, 727 (11th Cir.1988). The Supreme Court has clarified and simplified this inquiry by holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006).

> In Garcetti, a Los Angeles County deputy district attorney wrote two disposition memoranda recommending dismissal of the charges in a case, in which his research revealed that a search warrant affidavit contained misrepresentations. A meeting involving the deputy district attorney, his supervisors, and employees of the Los Angeles County Sheriff's Department, which allegedly became heated, was conducted to discuss the search warrant affidavit. Despite the concerns expressed by the deputy district attorney, the decision was made to proceed with the prosecution. He was called by the defense regarding the alleged misrepresentations at a hearing, but the trial judge rejected the challenge to the search warrant. The deputy district attorney subsequently was transferred from his calendar deputy position to a trial deputy position at another courthouse. He sued under § 1983 and alleged that his change in job and location had been retaliation for his speech; the Ninth Circuit agreed, but the Supreme Court reversed.

> Garcetti instructs that "[t]he proper inquiry is a practical one." Id. at 1961. Focusing on the "citizen" aspect of the First Amendment analysis, the Court determined that the research and memoranda were part of the deputy district attorney's official duties. Since his findings and recommendation were "pursuant

to" his official duties, he was not speaking as a citizen under the First Amendment. Id. at 1960. The Court determined that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id.

Following Garcetti, our circuit has modified the analysis of the first step of the Pickering test for analyzing alleged government employer retaliation to determine if an employee's speech has constitutional protection by deciding at the outset (1) if the government employee spoke as an employee or citizen and (2) if the speech addressed an issue relating to the mission of the government employer or a matter of public concern. D'Angelo v. School Bd. of Polk County, Fla., 497 F.3d 1203, 1209 (11th Cir.2007). FN12 To qualify as constitutionally protected speech in the First Amendment, government employment retaliation context that warrants the Pickering analysis, as Garcetti has specified, the speech must be made by a government employee speaking as a citizen and be on a subject of public concern. See Phillips v. City of Dawsonville, 499 F.3d 1239, 1242 (11th Cir.2007) (per curiam) (concluding in a First Amendment, retaliation case following Garcetti that the government employee "was speaking in accord with her duty as the City Clerk and not as a private citizen"); Vila v. Padrón, 484 F.3d 1334, 1339 (11th Cir.2007) (acknowledging after Garcetti that, to analyze a First Amendment, retaliation claim for speech by a government employee, "[t]he threshold question is whether [the government employee] spoke as a citizen on a matter of public concern"); Mills v. City of Evansville, Ind., 452 F.3d 646, 647-48 (7th Cir.2006) (recognizing that "[o]nly when a government employer penalizes speech that a plaintiff utters 'as a citizen' must the court consider" the Pickering analysis). If the government employee, however, was speaking as an employee, then there can be no First Amendment issue, and the constitutional inquiry ends with no consideration of the Pickering test. See Mills, 452 F.3d at 647 ("Garcetti ... holds that before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking 'as a citizen' or as part of her public job." (emphasis added)). Therefore, "[t]he Pickering balance is not triggered unless it is first determined that the employee's speech is constitutionally protected." Ferrara v. Mills, 781 F.2d 1508, 1513-14 (11th Cir.1986).

"A court must therefore discern the purpose of the employee's speech-that is, whether she spoke on behalf of the public as a citizen, or whether the employee spoke for herself as an employee." Morgan v. Ford, 6 F.3d 750, 754 (11th Cir.1993) (per curiam). Importantly, "the interests of the [government employee], as a citizen, in commenting upon matters of public concern" must be balanced with "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, 391 U.S. at 568, 88

S.Ct. at 1734-35. Therefore, "in the First Amendment context, courts review
restrictions on employees' speech with greater deference in order to balance the
government employer's legitimate interests in its mission." Engquist v. Oregon
Dep't of Agric., 478 F.3d 985, 995 (9th Cir.2007) (citing Garcetti, 126 S.Ct. at
1960). Accordingly, we initially must decide whether Boyce and Robinson spoke
as government employees or as citizens. Deciding whether a government
employee's speech relates to his or her job as opposed to an issue of public
concern "must be determined by the content, form, and context of a given
statement, as revealed by the whole record." Connick, 461 U.S. at 147-48, 103
S.Ct. at 1690.

Boyce v. Andrew, 510 F. 3d 1333, 1341-1343 (11th Cir. 2007).

Viewing the content, form, and the context of Miller's speech, and the record as a whole,

the Court finds that Miller has not engaged in protected speech as a citizen.  Miller was a

member of the faculty at USA, she was at a faculty meeting which had been called at least in part

for the search committee to discuss with the faculty the applicants to be interviewed for the

professor positions and the actions taken by the search committee.  Miller questioned the

integrity of the search committees' results by making comments to Halbrooks, a member of the

search committee and engaging in a possibly heated conversation with the Chair of the search

committee, Hollingsworth, about the selection of nine white male candidates.  Also, even Miller

believes that she spoke as part of her duties as a faculty member and not as a private citizen. ("I

considered it part of my job as a faculty member to work toward more sound governance by

pointing out diversity concerns and suggesting methods of improvement.  My suggestions,

however, were not taken seriously and, in fact were often met with hostility.") (doc. 59-2, p. 11,

Miller Affidavit, ¶ 38).  Although the public may have an interest in the diversity of the faculty

in the English Department at USA, Miller simply did not speak on behalf of the public as a

citizen.  See Abdur-Rahman v. Walker, 567 F.3d 1278, 1283 (11th Cir. 2009), citing Garcetti,

547 U.S. at 421, 424, 126 S.Ct. at 1959-60, 1961 ("In Garcetti, the practical inquiry was

straightforward because Ceballos admitted that he wrote the memorandum as part of his job duties. On the basis of this admission, the Court concluded that the memorandum was not protected speech."). Accordingly, summary judgment is granted in favor of all defendants as to Miller's claim under § 1983.[18]

Defendants Hollingsworth and McLaughlin in their individual capacity

Defendants Hollingsworth and McLaughlin also argue that they are also entitled to summary judgment because they did not have supervisory authority over Miller, i.e., were not the final decision-makers in the decision to non-reappoint. Thus, the defendants argue, there is no basis to allege that they used their authority to deprive Miller of her right to free speech.

Miller responds that McLaughlin and Hollingsworth were "decision-makers" in that they influenced the decision of Walker and Dean Johnson, who in turn influenced the decision of Dr. Covey (doc. 60, Miller response) ("McLaughlin and Hollingsworth each participated in the decision to non-reappoint Miller, including providing faculty input required to either Walker or Dean Johnson.") (Id. p. 33). Miller argues that Walker, McLaughlin and Hollingsworth "acted in concert to stifle her continued advocacy of minority issues"[19] and that "those decisionmakers Walker, McLaughlin and Hollingsworth, should be held accountable since their actions violate clearly established law.

In order to prevail on her claim under 42 U.S.C. § 1983, Miller must show that

_____

[18] Because Miller has failed to establish a claim under § 1983 as a matter of law, the Court need not address whether the defendants are entitled to qualified immunity.

[19] Miller cited to 42 U.S.C. § 1985(3) in the jurisdictional section of her complaint (doc. 1, p. 2). However, Miller did not plead a cause of action for conspiracy. She brings two counts: Count One under Title VII for retaliation and Count Two for violation of her rights under the First Amendment pursuant to 42 U.S.C. § 1983.

Hollingsworth and McLaughlin deprived her of a right secured under the United States Constitution or federal law and that the deprivation occurred while they were acting under color of state law. Arrington v. Cobb County, 139 F.3d 865, 872 (11th Cir.1998). "[S]tate employment is generally sufficient to render the defendant a state actor." Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 n. 18, 102 S.Ct. 2744, 2752 n.18 (1982). However, a "person acts under color of state law when he acts with authority possessed by virtue of his employment with the state[.]" Almand v. DeKalb County, 103 F.3d 1510, 1513 (11th Cir.1997), cert. denied, 522 U.S. 966, 118 S.Ct. 411 (1997) (citations omitted). Thus, the Court must determine whether Hollingsworth and McLaughlin deprived Miller of her First Amendment rights, pursuant to the authority they possessed as state employees. Edwards v. Wallace Community College, 49 F.3d 1517, 1522-23 (11th Cir.1995) citing Monroe v. Pape, 365 U.S. 167, 184, 81 S.Ct. 473, 482 (1961).

There is no dispute that although Hollingsworth and McLaughin were employed by the state, they had no authority to non-reappoint Miller or to otherwise alter the conditions of her work. In other words, McLaughlin and Hollingsworth had no authority which they could exercise in a retaliatory manner such that would violate Miller's rights under the First Amendment. See Edwards at 1522-23 (finding that co-workers without supervisory authority could not be held liable under §1983 for plaintiff's alleged discriminatory discharge and hostile workplace). Accordingly, McLaughlin and Hollingsworth are entitled to judgment as a matter of law on this basis also.

IV.    Conclusion

For the reasons set forth herein, summary judgment is **GRANTED** in favor of defendants USA, Walker, Hollingsworth and McLaughlin.

**DONE** and **ORDERED** this **14th day of May, 2010.**


                                        s / Kristi K DuBose
                                       **KRISTI K. DuBOSE**
                                       **UNITED STATES DISTRICT JUDGE**